Carlyne **TERBOVITZ, Plaintiff-Appellee,**

v.

**FISCAL COURT OF ADAIR COUNTY, KENTUCKY, Defendant-Appellant.**

No. 86–5814.

United States Court of Appeals, Sixth Circuit.

Argued May 14, 1987.

Decided Aug. 5, 1987.

---

1. De Lisle testified as follows:

Q. Do you know a person named Chris Nezamis? [sic]

A. Sure.

Frank Hampton Moore, Jr., argued, Cole, Harned and Broderick, Bowling Green, Ky., for defendant-appellant.

Daniel B. Goldberg, Appalachian Research and Defense Fund of Ky., Columbia, Ky., Jennifer B. Coffman, argued, Lexington, Ky., for plaintiff-appellee.

Before JONES and RYAN, Circuit Judges; and CELEBREZZE, Senior Circuit Judge.

CELEBREZZE, Senior Circuit Judge.

Defendant Fiscal Court of Adair County, Kentucky ("Fiscal Court"), the governing body of the county, appeals from the district court's judgment that the Fiscal Court refused to hire plaintiff Carlyne Terbovitz because of her sex in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* (1982). The Fiscal Court argues that the district court erred in finding that the CETA representatives were agents of the Fiscal Court, that the Fiscal Court's asserted nondiscriminatory reason for its failure to hire Terbovitz was pretextual, and that the award of back pay should be computed until the date of judgment. Because we conclude that none of the contested factual findings is clearly erroneous, we affirm.

In 1979, the Fiscal Court operated an ambulance service in Adair County. Although it had contracted with the Lake Cumberland Emergency Medical Services System, Inc. ("LCEMSS") to manage the ambulance service, the Fiscal Court retained the authority to hire ambulance service employees. LCEMSS interviewed job applicants to assure minimum qualifications, but then their applications were presented to the Fiscal Court for its final hiring decision. An additional step in the hiring process was required, however, if the open position was to be initially funded under the federal Comprehensive Employment and Training Act ("CETA"): job applicants were first required to be certified as eligible to receive CETA funds. CETA representatives Ralph Snead and his subordinate Pat Long Scott, who were not Adair County employees, were stationed at the Adair County Courthouse to facilitate the certification process. Only applicants certified as CETA eligible by Snead or Scott were interviewed by LCEMSS. The Fiscal Court, however, always had the final say as to which applicant would be hired.

Carlyne Terbovitz desired one of the six emergency medical technician ("EMT") po-sitions that opened with the ambulance service in August, 1979. Because five of the six positions were to be CETA funded,[1] Terbovitz sought certification from CETA representative Scott. Scott told Terbovitz that she was ineligible to receive CETA funds, however, because her husband was already receiving CETA funds as an EMT for the ambulance service. Scott cited the CETA antinepotism regulation, which states that a person is ineligible to receive CETA funds "if a member of that person's immediate family is engaged in an administrative capacity for that recipient." 20 C.F.R. § 676.66 (1986). Not satisfied with this explanation, Terbovitz contacted the Kentucky CETA headquarters and was told that the antinepotism regulation precluded her eligibility only if her husband was an administrator of the CETA program. Since her husband was not an administrator, Terbovitz informed CETA representative Scott that she was in fact eligible to receive CETA funds. According to Terbovitz's testimony, Scott then permitted her to fill out an application, but warned her that the county would not hire a female EMT.

One week later, Terbovitz returned to check the status of her application, but was told that it had been "lost." She completed another application and served copies of it on Ralph Snead, the head CETA representative; LCEMSS; Earl Cundiff, the manager of the ambulance service; and the Adair County Judge-Executive, who is the county's chief officer. Terbovitz testified that she was again informed by both Ralph Snead and Earl Cundiff that a female EMT would not be hired.

In the end, Terbovitz was not hired. She was not certified as eligible to receive CETA funds, and her application never came before the Fiscal Court for its final hiring decision. All six EMT positions were filled by men. Terbovitz subsequently brought this suit, alleging that the Fiscal Court refused to hire her because of her

---

**1.** Terbovitz argues that the Fiscal Court's failure to hire her into the sixth position, which was immediately funded by the county, provides an independent ground supporting the district court's finding of intentional discrimination.

Because we affirm the district court's factual findings concerning the Fiscal Court's refusal to hire Terbovitz into one of the CETA-funded positions, *see infra,* however, we need not address Terbovitz's alternative argument.

sex in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* (1982).

At trial, Terbovitz presented direct evidence through her own testimony that both of the CETA representatives and Earl Cundiff told her that the county would not hire a female EMT. Although the Fiscal Court apparently contested whether these statements were in fact made, its primary defense was that any discriminatory actions taken by the CETA representatives were not attributable to the Fiscal Court since the CETA representatives were not employees of the Fiscal Court. The Fiscal Court also argued to the trial court that Terbovitz would not have been hired in any event, because the CETA representatives had held a "good faith belief" that she was ineligible under CETA by virtue of her husband's employment.

The district court, after a bench trial, analyzed this case under the familiar three-part framework outlined in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802–04, 93 S.Ct. 1817, 1824–25, 36 L.Ed.2d 668 (1973), and *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 252–53, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207 (1981). Initially, the court held that Terbovitz established a prima facie case of sex discrimination.[2] Although the district court recognized that the Fiscal Court itself had never actually considered and rejected Terbovitz's application, the court nonetheless concluded that the CETA representatives' rejection of Terbovitz's application was attributable to the Fiscal Court because the CETA representatives were acting as agents of the Fiscal Court. The court further concluded that the Fiscal Court's asserted nondiscriminatory justification—that the CETA representatives held a "good faith belief" that Terbovitz was ineligible to receive CETA funds—was pretextual. In finding pretext, the court explicitly cred-

ited Terbovitz's testimony that the two CETA representatives and Earl Cundiff had told her that the county would not hire a female EMT. Accordingly, the district court found that Terbovitz satisfied her ultimate burden of proving that the Fiscal Court had intentionally discriminated against her. *See Tye v. Board of Educ. of the Polaris Joint Vocational School Dist.,* 811 F.2d 315, 317–18 (6th Cir.1987); *Mills v. Ford Motor Co.,* 800 F.2d 635, 637–38 (6th Cir.1986); *Jackson v. RKO Bottlers of Toledo, Inc.,* 743 F.2d 370, 374–75 (6th Cir. 1984), *cert. denied,* —— U.S. ——, 106 S.Ct. 3298, 92 L.Ed.2d 712 (1986). The court awarded Terbovitz back pay from 1979 until the date of the court's judgment in 1985, attorney's fees, expenses, and costs.

Preliminarily, we note that the parties have continued on appeal to argue this case under the *McDonnell Douglas* evidentiary framework. The *McDonnell Douglas* formula proceeds under the assumption that a single motive explains the employer's decision to take an employment action adverse to the plaintiff. *See Haskins v. United States Dep't of the Army,* 808 F.2d 1192, 1197 (6th Cir.1987); *Bibbs v. Block,* 778 F.2d 1318, 1320–21 (8th Cir.1985) (en banc). The shifting burdens of *McDonnell Douglas* are designed to determine which motive—the alleged unlawful discrimination or the employer's asserted nondiscriminatory justification—is the "true" reason for the employer's adverse employment action. *See Haskins,* 808 F.2d at 1197; *Bibbs,* 778 F.2d at 1320–21. The plaintiff at all times retains the burden of proving that the discriminatory motivation was more likely than not the "true" reason for the employer's decision. *See Haskins,* 808 F.2d at 1197; *Jackson,* 743 F.2d at 375.

■ The *McDonnell Douglas* formula is inapplicable, however, to cases in which the

---

**2.** A Title VII plaintiff establishes a prima facie case by proving facts that give rise to an inference of unlawful discrimination. *See Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 253–54, 101 S.Ct. 1089, 1093–94, 67 L.Ed.2d 207 (1981). In a "failure to hire" case such as this one, the plaintiff may satisfy this burden by proving: (1) that she is a woman; (2) that she

applied and was qualified for the open position; (3) that she was rejected; and (4) that, after her rejection, the employer continued to seek applications from persons of plaintiff's qualifications. *See McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973).

Title VII plaintiff presents credible, direct evidence of discriminatory animus. *See Trans World Airlines, Inc. v. Thurston,* 469 U.S. 111, 121, 105 S.Ct. 613, 621, 83 L.Ed.2d 523 (1985); *Blalock v. Metals Trades, Inc.,* 775 F.2d 703, 707 (6th Cir. 1985). As this court stated in *Blalock,* "Direct evidence and the *McDonnell Douglas* formulation are simply different evidentiary paths by which to resolve the ultimate issue of defendant's discriminatory intent." *Id.* Direct evidence of discrimination, if credited by the fact finder,[3] removes the case from *McDonnell Douglas* because the plaintiff no longer needs the inference of discrimination that arises from the prima facie case. Upon crediting the plaintiff's direct evidence, the district court finds facts requiring the conclusion that unlawful discrimination was at least a "motivating factor" for the employer's actions. *See id.* at 707–10. The existence of unlawful discrimination is patent, and if the employer does not propose an alternative explanation for its actions, Title VII liability will automatically follow.

■ If the employer does assert an alternative justification for its employment action, however, it will be arguing, either explicitly or by implication, that although discriminatory motivation may have entered into its employment decision, the same decision would have been made regardless of the discrimination. At this point, the case becomes a "dual motive" or "mixed motive" case, and the crucial issue becomes one of causation. *See Haskins,* 808 F.2d at 1197. However, because discrimination has already been established by the plaintiff's direct evidence, the employer must do more than merely "articulate" its nondiscriminatory justification as required under *McDonnell Douglas. See Blalock,* 775 F.2d at 710. In *Blalock,* we adopted

the causation standard of *Mt. Healthy City School Dist. Board of Educ. v. Doyle,* 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977), under which the burden shifts to the employer to prove by a preponderance of the evidence "that the adverse employment action would have been taken even in the absence of the impermissible motivation." *Blalock,* 775 F.2d at 712. Thus, once the district court accepts the plaintiff's direct evidence, the employer's asserted nondiscriminatory reason for its action, which must merely be "articulated" under *McDonnell Douglas,* effectively becomes an affirmative defense on which the employer bears the burden of proof. *Cf. NLRB v. Transportation Management Corp.,* 462 U.S. 393, 400, 103 S.Ct. 2469, 2473, 76 L.Ed.2d 667 (1983) (applying "dual motive" analysis in unfair labor context).

In the instant case, the district court expressly credited Terbovitz's testimony, direct evidence that she had not been hired because of her sex, and thus necessarily concluded that unlawful discrimination was at least a motivating factor in the refusal to hire her. *See Blalock,* 775 F.2d at 707–10. Since the district court also concluded that the CETA representatives were acting as agents of the Fiscal Court, the Fiscal Court then had the burden of proving that the same decision would have been made absent the discriminatory motivation. *See id.* at 712. The district court, however, disbelieved the Fiscal Court's asserted nondiscriminatory reason for the employment action. Although this conclusion was made in the course of the court's *McDonnell Douglas* analysis, we conclude that this finding of pretext, if correct, also supports the conclusion that the Fiscal Court failed in its burden of proving that the same decision would have been made regardless of the discriminatory motivation.[4] *See id.*

---

**3.** Of course, if the district court does not believe the plaintiff's proffered direct evidence, then the evidentiary framework of *McDonnell Douglas* is the proper mode of analysis. *See Blalock v. Metals Trades, Inc.,* 775 F.2d 703, 707–08 (6th Cir.1985). Thus, as we said in *Blalock:* " 'When direct evidence of discrimination has been introduced, the lower court must, as an initial matter, specifically state whether or not it believes plaintiff's proffered direct evidence of dis-

crimination.' " *Id.* at 708 (quoting *Thompkins v. Morris Brown College,* 752 F.2d 558, 564 (11th Cir.1985)). In this case, the district court specifically credited Terbovitz's direct evidence.

**4.** As noted above, the *Blalock* dual-motive analysis addresses the question of causation, and not whether the employer's asserted justification is worthy of belief. *See Haskins v. United States Dep't of the Army,* 808 F.2d 1192, 1197 (6th

Thus, analyzed as a dual-motive case,[5] the key questions necessary to determine the Fiscal Court's liability to Terbovitz are whether the district court properly credited Terbovitz's testimony,[6] whether the trial court erred in finding an agency relationship, and whether the district court was justified in finding that the Fiscal Court's alternative explanation for why Terbovitz was not hired was unworthy of credence.

On appeal, the Fiscal Court's first contention is that the district court erred in finding that the CETA representatives were acting as the Fiscal Court's agents. The existence of an agency relationship, as well as the district court's findings concerning pretext and discriminatory effects which are considered below, is a finding of fact that must be upheld on appeal unless "clearly erroneous." Fed.R.Civ.P. 52(a); see *Pullman-Standard v. Swint,* 456 U.S. 273, 285–90, 102 S.Ct. 1781, 1788–91, 72 L.Ed.2d 66 (1982) (no distinction under Rule 52(a) between "subsidiary" and "ultimate" findings of fact); *Henry v. Lennox Indus., Inc.,* 768 F.2d 746, 749–50 (6th Cir.1985). The reviewing court must be " 'left with the definite and firm conviction that a mistake has been committed' " to overturn a factual finding as clearly erroneous. *Anderson v. City of Bessemer City, N.C.,* 470 U.S. 564, 573, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985) (quoting *United States v. United States Gypsum Co.,* 333 U.S. 364, 395, 68 S.Ct. 525, 541, 92 L.Ed. 746 (1948)). If the district court's resolution of

a factual question is plausible considering the record as a whole, the court of appeals may not reverse it. "Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *Id.* 470 U.S. at 573–74, 105 S.Ct. at 1511–12.

Under Title VII, an employer may be held liable for discriminatory actions that are perpetrated by its agents. *See* 42 U.S.C. § 2000e(b) (1982) ("The term 'employer' means a person engaged in an industry affecting commerce ... and *any agent* of such a person...." (emphasis added)). An employer, therefore, may not avoid Title VII liability by delegating its discriminatory programs to third parties. *See City of Los Angeles Dep't of Water & Power v. Manhart,* 435 U.S. 702, 718 n. 33, 98 S.Ct. 1370, 1380 n. 33, 55 L.Ed.2d 657 (1978); *see also* Restatement (Second) of Agency § 19 comment c (1957) (principal liable for illegal acts taken by agent at principal's direction). The district court may find an agency relationship "only if there has been a manifestation by the principal to the agent that the agent may act on his account, and consent by the agent so to act." Restatement § 15; *see id.* § 1. The agency relationship, however, may be established without a formal contract and absent consideration paid by either party. *See* Restatement §§ 16, 26. Thus, the question for our review is whether the district court clearly erred in concluding that the CETA representatives were acting at

---

Cir.1987). If the district court had applied this analysis, it could have found the Fiscal Court liable because it failed to prove that the same decision would have been made absent the discrimination. *See Blalock,* 775 F.2d at 712. The court, therefore, would not have been required to face the more searching question of whether the Fiscal Court's asserted nondiscriminatory justification was unworthy of belief. However, having arrived at the stronger conclusion that the justification offered by the Fiscal Court was pretextual, it necessarily follows, in the absence of any other alternative explanations, that the Fiscal Court also failed to meet its burden under the dual-motive analysis. Therefore, although we recognize that a district court's failure to apply the proper analytical framework may, in the appropriate case, require remand, *see, e.g., id.* at 713, such a disposition is not necessary in the instant case.

5. Even if we were to analyze this case under *McDonnell Douglas,* our affirmance of each of the challenged findings of fact, *see infra,* would compel the conclusion that the district court properly found that the Fiscal Court had unlawfully discriminated against Terbovitz.

6. It is unclear whether the Fiscal Court challenges as clearly erroneous the district court's findings that the two CETA representatives and Earl Cundiff made the discriminatory statements to Terbovitz. However, because those findings were arrived at by crediting Terbovitz's "coherent and facially plausible story that [was] not contradicted by extrinsic evidence," *Anderson v. City of Bessemer City, N.C.,* 470 U.S. 564, 575, 105 S.Ct. 1504, 1512, 84 L.Ed.2d 518 (1985), we conclude that they are not clearly erroneous.

the Fiscal Court's direction when they told Terbovitz that a female EMT would not be hired and when they refused to certify her.

■ The record before the district court supports its conclusion that the CETA representatives were acting as the Fiscal Court's agents for the limited purpose of screening applicants for CETA-funded EMT positions. A former president of LCEMSS, Randall Herron, testified that the CETA representatives, the Judge-Executive, and the Fiscal Court worked together in making hiring decisions. Lee Godwin, a former assistant manager of LCEMSS, similarly testified that the Fiscal Court actively exercised its authority over hiring decisions. Godwin further stated that in 1979 he was explicitly told by the Judge-Executive and another member of the Fiscal Court that no female EMT's would be hired. The district court also credited Terbovitz's testimony that the CETA representatives gave the same warning to her, *i.e.,* no women would be hired as EMT's. Under these circumstances, the district court could rationally conclude that the CETA representatives' statements that a female EMT would not be hired were statements of the hiring policy of the Fiscal Court, and that their refusal to certify Terbovitz was done at the behest of the Fiscal Court in furtherance of that policy. *See* Restatement §§ 1, 15. Therefore, the district court's finding that the CETA representatives were acting as the Fiscal Court's agents when they told Terbovitz that a female EMT would not be hired and when they refused to certify her was not clearly erroneous. *See Anderson,* 470 U.S. at 573–74, 105 S.Ct. at 1511–12. Consequently, the CETA representatives' discriminatory statements—direct evidence of discrimination—were properly attributed to the Fiscal Court, *see* 42 U.S.C. § 2000e(b); Re-

statement § 19 comment c, which then had the burden of proving that the same decision would have been made in the absence of the discriminatory motivation. *See Blalock,* 775 F.2d at 712.

■ To establish that Terbovitz would not have been hired anyway, the Fiscal Court asserted that the CETA representatives held a "good faith belief" that she was ineligible under CETA because her husband was already receiving CETA funds. Analyzing the case under *McDonnell Douglas,* the district court found, however, that the asserted justification was pretextual. The Fiscal Court now challenges this finding, but we conclude that the district court did not clearly err in deciding that the asserted justification was not worthy of belief. Accordingly, properly analyzed as a dual-motive case, we conclude that the Fiscal Court necessarily failed to meet its burden of showing that the same decision would have been made absent the discriminatory animus. *See supra* note 4.

The district court rationally determined that the evidence undermined the veracity of the Fiscal Court's asserted "good faith belief" that Terbovitz was not eligible to receive CETA funds. The court first reviewed the language of the CETA antinepotism regulation, which clearly states that it applies only if a member of the applicant's "immediate family is engaged in an administrative capacity" in the CETA program. *See* 20 C.F.R. § 676.66 (1986). It is undisputed that Terbovitz's husband was never an administrator. More importantly, even when Terbovitz informed the local CETA representatives that, according to CETA headquarters, the regulation did not in fact preclude her eligibility, they refused to certify her.[7] This refusal, in the face of a

---

7. The Fiscal Court erroneously argues that the district court "made a specific finding that Ms. Terbovitz 'didn't communicate that on to Mr. [Ralph] Sneed (sic) or anybody else who was involved.'" *See* Defendant's Brief 8. The district court, ruling from the bench, actually stated:

> [Terbovitz] went to the point of telling them [the CETA representatives] about, she had checked up on it from the State of Kentucky

and was told about what the qualifications are, and so she corrected it early on.

So I don't think that even if that is a defense, that the defendants can rely upon it, because the plaintiff quickly got word to Mrs. Long—that was her name, now Scott—got word to her, so she had no reason to think otherwise at that point. *Maybe* she didn't communicate that on to Mr. Snead or anybody else who was involved, but it was clear

contrary, authoritative interpretation of the regulation, was persuasive evidence that the asserted "good faith belief" was not the true reason for refusing to hire her. Accordingly, we conclude that the district court did not clearly err in finding that the asserted "good faith belief" was not worthy of credence. Having rejected the Fiscal Court's nondiscriminatory explanation for its refusal to hire Terbovitz, the district court properly held that the Fiscal Court discriminated against Terbovitz in violation of Title VII.[8] *See supra* note 4.

▮ Finally, the Fiscal Court contends that the district court erred in computing back pay from 1979 until the date of judgment in 1985. The Fiscal Court argues that any effects of its discriminatory employment action terminated in 1981, when the CETA funding expired, or in 1982, when LCEMSS became insolvent and discontinued its operations. The evidence before the district court, however, revealed that all five EMT's hired under the CETA program in 1979 were put on the county payroll when their CETA funding expired. Similarly, when LCEMSS folded, the ambulance service was continued uninterrupted, and the EMT's hired in 1979 continued to collect their pay from the Fiscal Court. Under these circumstances, the district court did not clearly err in concluding that the effects of the unlawful refusal to hire Terbovitz lasted until the date of judgment. Pursuant to the "make whole" purpose of relief under Title VII, *see Albemarle Pa-*

per Co. v. Moody, 422 U.S. 405, 418–22, 95 S.Ct. 2362, 2372–73, 45 L.Ed.2d 280 (1975), therefore, the court properly awarded back pay until the date of judgment.

For the foregoing reasons, the judgment of the district court is AFFIRMED.

---

by that time, early in this particular case, by August of '79, I think, when she made her application that she was eligible.

Jt.App. 91 (district court ruling from bench) (emphasis added). Although this statement does not clearly reveal whether the district court believed that Snead had been told of Terbovitz's eligibility, it discloses the district court's explicit finding that Terbovitz at the very least told CETA representative Scott of her eligibility. In addition, the court's initial statement that Terbovitz told "them," and the use of the word "maybe" to introduce the statement on which the Fiscal Court relies, implies that the court thought that Snead also had been told. We therefore reject the Fiscal Court's attempt to recharacterize this finding of fact.

**8.** The Fiscal Court relies on *Doe v. AFL–CIO, Dep't of Organization, Region 6, Atlanta, Ga.,* 405 F.Supp. 389 (N.D.Ga.1975), *aff'd,* 537 F.2d

1141 (5th Cir.1976), *cert. denied,* 429 U.S. 1102, 97 S.Ct. 1127, 51 L.Ed.2d 552 (1977), for the proposition that if its decision not to hire Terbovitz "was for lawful reasons, even though defendant acted impulsively or on bad advice, then the defendant has not violated Title VII." *Id.* at 392. The Fiscal Court asserts, therefore, that the CETA representatives' incorrect interpretation of the regulation is not a ground for Title VII liability. In *Doe,* however, the employer's asserted nondiscriminatory reason for firing the plaintiff—that he was an ineffective worker—was not refuted by the plaintiff under the third prong of *McDonnell Douglas. Id.* at 393–94. In this case, on the other hand, the Fiscal Court's nondiscriminatory justification has been found to be untrue. Therefore, the principles announced in *Doe* have no relevance here.