## Thomas MARTHEL

v.

## BRIDGESTONE/FIRESTONE, INC.

No. 3:94–0950.

United States District Court,
M.D. Tennessee,
Nashville Division.

April 22, 1996.

Michael Henry Sneed, Nashville, TN, for plaintiff.

Robert Earl Boston, Nashville, TN, for defendant.

**1296**

*MEMORANDUM*

CAMPBELL, District Judge.

Pending before the Court is the defendant's Motion for Summary Judgment (Docket No. 10), and the plaintiff's response thereto.

The Court has subject matter jurisdiction over the plaintiff's claims under 42 U.S.C. § 2000e–5(f)(3), pursuant to 28 U.S.C. §§ 1331 and 1343.

For the reasons discussed below, the Court GRANTS the defendant's motion. Accordingly, this action is DISMISSED.

*Factual Background*

The plaintiff, Thomas Marthel, filed this action under Title VII, 42 U.S.C. § 2000e, *et seq.,* as amended by 42 U.S.C. § 1981 and 42 U.S.C. § 1981a, claiming that his termination from Bridgestone/Firestone, Inc. ("Bridgestone") on two separate occasions was based on racial discrimination. In addition, the plaintiff claims the second termination was also in retaliation for his having filed a claim with the Equal Employment Opportunity Commission ("EEOC"). The plaintiff claims this same conduct violates 42 U.S.C. §§ 1983 and 1988, as well as Tennessee common law prohibiting "outrageous conduct" and "wrongful discharge."

The defendant hired the plaintiff, a black male, in June, 1976. (¶ 2 of Defendant's Statement of Undisputed Material Facts).[1] During his employment the plaintiff was repeatedly disciplined for attendance problems. (*Id.* at ¶ 3).

During 1992, Bridgestone attempted to enforce strictly its attendance policy based on its belief that the company was suffering from an unwarranted plant-wide absentee problem. (*Id.* at ¶ 4). The policy states that excessive absenteeism may be a cause for disciplinary action, including discharge. (*Id.*) An employee absent for one week, the policy provides, shall be considered to have quit, but the employee will be reinstated "if he presents satisfactory evidence that his failure

to report was due to circumstances beyond his control." (*Id.*)

Between October 19, 1992 and November 30, 1992, the plaintiff did not report to work. (*Id.* at ¶ 6). The plaintiff stated that he was sick, but provided no further details. (*Id.*)

On November 12, 1992, Jim Davenport, Bridgestone's Industrial Relations Manager at the plant, sent the plaintiff a letter by certified mail advising him to report to the company's Health Services Department and provide "release to return to work" papers from his doctor before returning to work. (*Id.*) On November 28, 1992, the letter was returned by the post office and marked undeliverable. (*Id.*)

When the plaintiff returned to. work on November 30, 1992, his supervisor, Tommy Batson, and personnel in the Health Services Department told the plaintiff that he could not return to work until he provided them with a release form from his doctor. (*Id.* at ¶ 7). The plaintiff indicated that he did not have a doctor's statement, but that he could provide one the next day. (*Id.*)

On December 1, 1992, the plaintiff returned to work with a "certificate to return to work or school" signed by a Dr. Johnson. (*Id.*) at ¶ 8. The plaintiff presented the note to Mr. Batson, who in turn, examined the note and asked the plaintiff whether the person who wrote the note was really a doctor. (*Id.*) Mr. Batson forwarded the note to Bridgestone's Human Services Dept. (*Id.*)

Mr. Davenport and Mike Reeder examined the note and did not believe the note was written by a medical professional because it contained a misspelling of the plaintiff's name, and an apparent misuse of the abbreviation "RX," and apparent difficulty with the spelling of the word "pneumonia." (*Id.* at ¶ 9). Mr. Davenport and Mr. Reeder attempted to verify the doctor's note presented .by the plaintiff. (*Id.* at ¶ 10). They were unable to locate Dr. Johnson at the number on the note, and calls to the number were answered by an answering machine stating

---

1. The plaintiff has not complied with Local Rule 8(b)(7)(c) in responding to Defendant's Statement of Undisputed Material Facts (Docket No. 12). Therefore, for purposes of this Motion, the

Court must assume that the plaintiff does not dispute the 47 statements of undisputed fact submitted by the defendant.

that the caller had reached "the Hayes residence." (*Id.* at ¶ 11).

Mr. Davenport scheduled an investigative meeting with the plaintiff at which the plaintiff was represented by Tommy Powell, his union representative. (*Id.* at ¶ 12). Although the plaintiff disputes that he was uncooperative at the meeting, the parties appear to agree that the plaintiff eventually told those present that he had telephoned Dr. Johnson at Dr. Johnson's fiancee's house and that Dr. Johnson would, in turn, telephone Mr. Davenport. (*Id.* at ¶ 14). Mr. Davenport told the plaintiff that he would talk with Dr. Johnson if he called, but that he still needed to talk with the doctor at his office or visit with him personally. (*Id.* at ¶ 14). Mr. Davenport told the plaintiff to return to work for the day, but that he would not be allowed to return to work thereafter unless he received information which would allow Mr. Davenport to verify the doctor's excuse. (*Id.*)

Mr. Davenport subsequently received a telephone call from someone claiming to be "Dr. Johnson." (*Id.* at ¶ 15). In answer to questioning by Mr. Davenport, the caller stated that he did not know when he first saw the plaintiff and that Mr. Davenport did not need that information; the caller did not know how many times he had seen the plaintiff; the caller was not sure where he had seen the plaintiff for his visits and stated that he needed to talk with the plaintiff; the caller did not know where he had written the plaintiff's return to work excuse and again stated that he needed to talk with the plaintiff; and the caller did not have an office, did not work out of a hospital, and was not willing to meet personally with Mr. Davenport or talk with the plaintiff's union representative, Mr. Powell. (*Id.* at ¶ 15). Based on this conversation, Mr. Davenport did not believe that "Dr. Johnson" was, in fact, a doctor. (*Id.*)

Mr. Davenport then called the plaintiff back into the meeting, and informed him of the company's belief that the plaintiff had made himself unavailable for work without justification and had falsified a doctor's excuse. (*Id.* at ¶ 16). Mr. Davenport gave the plaintiff notice that Bridgestone was suspending him for two days pending further

investigation, and that the company intended to terminate his employment as a result of his excessive absenteeism and falsification of records, unless the plaintiff returned on December 4, 1992, with a doctor's statement on a doctor's stationery or with some type of heading which would indicate that "Dr. Johnson" was, in fact, a doctor. (*Id.*)

While the plaintiff was on suspension, Mr. Reeder telephoned several hospitals and was told that they had not heard of Dr. Johnson. (*Id.* at ¶ 17).

On December 4, 1992, the plaintiff presented a second doctor's statement. (*Id.* at ¶ 18). This statement also contained a misspelling of the plaintiff's name, and was not on doctor's stationery. (*Id.*) The statement also contained the same telephone number that had appeared on the original statement. (*Id.*) Mr. Davenport found this statement unsatisfactory, and advised the plaintiff that his employment was terminated for excessive absenteeism and falsification of records. (*Id.*)

On that same day, the plaintiff filed a grievance through the Union relating to his termination. (*Id.* at ¶ 24). During the grievance process, the plaintiff presented to Mr. Davenport a prescription receipt dated December 9, 1992, and a letter from Dr. Johnson containing a photocopy of his medical license to establish that Dr. Johnson was actually a doctor. (*Id.* at ¶ 25). In addition, in answer to an inquiry by Bridgestone, the Tennessee Board of Medical Examiners indicated in a letter dated January 11, 1993, that a Dr. Willie Johnson held the medical license number in question. (*Id.*)

Bridgestone claims that it did not reinstate the plaintiff at that point because it still had questions and concerns about his actual treatment by the doctor during his extended absence from work, and because the matter was being grieved by the parties. (*Id.*)

On March 5, 1993, Bridgestone and the plaintiff's union reached an agreement which allowed the plaintiff to return to work with full seniority and payment of full backpay. (*Id.* at ¶ 26). As part of the agreement, the plaintiff was suspended from work for three

days and placed in the "Counseling IV" stage of Bridgestone's progressive discipline policy for making himself unavailable for work. (*Id.* at ¶ 26).

On May 7, 1993, the plaintiff filed a charge of discrimination with the EEOC claiming that he was terminated in December, 1992, because of his race. (*Id.* at ¶ 29). Bridgestone employee Dan Leonard responded to the EEOC charge on behalf of the company. (*Id.* at ¶ 31). After conducting an investigation into the charge, the EEOC determined, on July 29, 1994, that there was no evidence to indicate that the December, 1992 discharge was based on racial discrimination, and dismissed the charge. (*Id.* at 44).

On April 13, 1994, one of the plaintiff's co-workers, Jerry Mattern, reported to one of Bridgestone's operation managers, Doug McArthur, and to one of its supervisors, Tony Jones, that he and the plaintiff were involved in a heated argument, and that when Mr. Mattern turned his back, the plaintiff struck him. (*Id.* at ¶ 33). Mr. McArthur convened a meeting with Mr. Mattern, the plaintiff, Union representatives Don Reeder and Tommy Powell, and company representatives Tony Jones and Ted Hill. (*Id.*)

Immediately prior to the meeting, the Union representatives requested a private meeting with the plaintiff and Mr. Mattern, both of whom were Union members. (*Id.* at ¶ 34). Following that meeting, Mr. Mattern recanted his earlier statement and informed the company representatives that the plaintiff had not struck him, but that he had been struck by a piece of rubber in an assembly line. (*Id.*)

Mr. McArthur and Mr. Jones did not believe Mr. Mattern's recanted statement. (*Id.* at ¶ 35). As a result, Mr. McArthur sent Mr. Mattern and the plaintiff home and turned the matter over to Mr. Davenport in Human Resources. (*Id.*)

Mr. Davenport met with Mr. Mattern and the plaintiff the next day. (*Id.* at ¶ 36). The plaintiff presented Mr. Davenport with a statement signed by Mr. Mattern stating that the plaintiff did not strike him. Based upon conversations with Mr. McArthur and Mr. Jones, which detailed Mr. Mattern's emotional state at the time he reported the assault, and based upon his conversations with three of Mr. Mattern's co-workers who had also been told of the assault by Mr. Mattern, Mr. Davenport did not accept Mr. Mattern's recanted version of the assault. (*Id.*)

Mr. Davenport offered that he would allow the plaintiff to accept disciplinary counseling and a 30 day unpaid suspension if he would acknowledge his improper conduct in connection with the assault. (*Id.* at ¶ 37). The plaintiff conveyed to Mr. Davenport through his Union representative that he "could shove it." (*Id.* at ¶ 37). Mr. Davenport then terminated the plaintiff's employment for allegedly striking a co-worker. (*Id.*)

On April 18, 1994, the plaintiff filed through his Union a grievance relating to his termination for striking Mr. Mattern. (*Id.* at ¶ 40). During the grievance process, Mr. Davenport determined that it would be appropriate for Bridgestone to reinstate the plaintiff to work and resolve the matter through arbitration. (*Id.*)

On May 11, 1994, Bridgestone and the plaintiff's Union reached an agreement which allowed the plaintiff to return to work at Bridgestone with the same rate of pay and benefits he was earning prior to his discharge. (*Id.*) As part of that agreement, Bridgestone suspended the plaintiff from work for 13 days and placed him in the "Counseling IV" step of Bridgestone's progressive discipline policy for striking a co-worker. (*Id.* at ¶ 41).

On May 9, 1994, the plaintiff filed a grievance challenging the suspension and counseling and seeking to recover back pay for the 13 days he was suspended. (*Id.*) As of the time the defendant filed its Motion for Summary Judgment, the grievance had been scheduled for arbitration, but had not yet been heard.

In April, 1994, the plaintiff filed a charge of discrimination with the EEOC, alleging that he was terminated from his employment at Bridgestone because of his race and in retaliation for having filed an earlier charge of discrimination relating to his earlier termination. (*Id.* at ¶ 42). On April 5, 1995, the

EEOC dismissed the plaintiff's charge of discrimination with respect to his second termination. (*Id.* at ¶ 46).

On July 29, 1994, the EEOC dismissed the plaintiff's charge of discrimination in relation to his first discharge. (*Id.* at ¶ 44).

### The Standards For Considering Summary Judgment

■ Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment may be rendered if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." In order to prevail, the movant has the burden of proving the absence of a genuine issue of material fact as to an essential element of the opposing party's claim. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). In determining whether the movant has met its burden, the Court must view the evidence in the light most favorable to the nonmoving party. *Matsushita Electric Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).

■ In order to defeat the motion, the nonmoving party is required to show, after an adequate time for discovery, that there is a genuine issue of fact as to every essential element of that party's case upon which he will bear the burden of proof at trial. *Celotex Corp.*, 477 U.S. at 323, 106 S.Ct. at 2553. In order to create a genuine factual issue, the nonmoving party must show "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). Although the nonmovant need not show that the disputed issue should be resolved in his favor, he must demonstrate that there are genuine factual issues that "properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Id.*

■ A preponderance of the evidence standard is used in this determination. *Id.*

Therefore, if the evidence offered by the nonmoving party is "merely colorable," or "is not significantly probative," the motion for summary judgment may be granted. *Id.* See also *Matsushita Electric*, 475 U.S. at 586, 106 S.Ct. at 1356.

■ Cases involving state of mind are not necessarily inappropriate for summary judgment. *Barnhart v. Pickrel, Schaeffer & Ebeling Co.*, 12 F.3d 1382, 1389 (6th Cir. 1993). For example, the Sixth Circuit has specifically upheld the grant of summary judgment in employment discrimination cases. See e.g., *Pierce v. Commonwealth Life Insurance Co.*, 40 F.3d 796 (6th Cir. 1994); *Mitchell v. Toledo Hospital*, 964 F.2d 577 (6th Cir.1992); *Davis v. Monsanto Chemical Co.*, 858 F.2d 345 (6th Cir.1988).

### The Framework for Analyzing Title VII Claims

■ Title VII prohibits discrimination by an employer against any individual on the basis of race, color, religion, sex, or national origin. 42 U.S.C. § 2000e–2(a). Racial discrimination is also prohibited by 42 U.S.C. § 1981. Claims brought under Section 1981 are governed by the same evidentiary framework that is applied to Title VII claims. *Patterson v. McLean Credit Union*, 491 U.S. 164, 185–88, 109 S.Ct. 2363, 2377–78, 105 L.Ed.2d 132 (1989).

The framework for analyzing a Title VII claim was established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). The *McDonnell Douglas* Court explained that, in order to prevail under Title VII, the plaintiff bears the initial burden of establishing a prima facie case of discrimination by a preponderance of the evidence. 411 U.S. at 801, 93 S.Ct. at 1824.

■ In order to make this showing in a case involving the plaintiff's discharge from employment, in the absence of direct evidence of discrimination, the plaintiff must demonstrate: (1) that he was in a protected class; (2) that he was qualified for the position held; (3) that he was subjected to an adverse employment decision; and (4) that he was replaced by someone outside of the

protected class. *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 506, 113 S.Ct. 2742, 2747, 125 L.Ed.2d 407 (1993); *Mitchell*, 964 F.2d at 582.

■ If the plaintiff makes this showing, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the action taken. *McDonnell Douglas*, 411 U.S. at 801, 93 S.Ct. at 1824. If the defendant is able to meet this burden, the plaintiff is then required to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were a pretext for discrimination. 411 U.S. at 803, 93 S.Ct. at 1825.

The Court has made clear that the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff. *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 251, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207 (1981).

*Application of Framework to the Facts Presented*

*Direct Evidence*

The plaintiff argues that an incident between him and his supervisor, Jim Davenport, a white male, is direct evidence of a racially discriminatory animus toward the plaintiff. Specifically, the plaintiff contends that Mr. Davenport wrote a note sometime in 1988 stating that "if any employees were caught sleeping, Mr. Marthel should be sent home." (Response to Motion for Summary Judgment at 3). The plaintiff argues that there is "no other justifiable reason for Mr. Davenport having this hostile attitude" toward him. (Response at 3–4).

As support for this factual statement, the plaintiff cites the affidavit he filed with his Response to the Motion for Summary Judgment. The Court has been unable to find a discussion of this matter in the plaintiff's affidavit. The plaintiff did discuss this incident in his deposition. (Deposition of Thomas Marthel at 46–49, 128–29). There he states that "Jim Davenport left a note to the effect if Thomas Marthel is caught asleep, send him home." (Marthel Deposition at 46). The plaintiff testified that Mr. Davenport left the note because of an earlier altercation between the two: "Jim Davenport told me to shut up, and I told him he could not tell me to shut up, he did not have a child named Thomas Marthel." (Marthel Deposition at 47).

■ The Sixth Circuit has defined "direct evidence" to be proof that establishes racial discrimination on its own, without application of the inference that may be created by applying the *McDonnell Douglas* formula. *Terbovitz v. Fiscal Court of Adair County*, 825 F.2d 111, 115 (6th Cir.1987). "Direct evidence" of discrimination "removes the case from *McDonnell Douglas* because the plaintiff no longer needs the inference of discrimination that arises from the prima facie case." *Id.* If credited by the fact finder, direct evidence proves that unlawful discrimination was at least a "motivating factor" for the employer's actions. *Id.*

In *Terbovitz*, 825 F.2d at 114, the court found direct evidence of unlawful discrimination based on the plaintiff's testimony that she was expressly told she would not be hired because she was a female.

■ The incident described by the plaintiff in this case simply does not constitute direct proof of racial discrimination. The plaintiff's race was not directly or indirectly mentioned by Mr. Davenport when he left instructions to send the plaintiff home if he was caught sleeping. Although the plaintiff may truly believe that Mr. Davenport's conduct in this regard was motivated by racial discrimination, a plaintiff's personal beliefs, conjecture and speculation as to the defendant's motivation are not competent evidence to withstand summary judgment. *Mitchell*, 964 F.2d at 584–85; *Chappell v. GTE Products Corp.*, 803 F.2d 261, 268 (6th Cir.1986). *See also Simpson v. Midland Ross Corp.*, 823 F.2d 937, 941 (6th Cir.1987) (conclusory allegations are insufficient proof of intentional discrimination). Accordingly, the Court concludes that the plaintiff has not shown sufficient direct evidence of unlawful discrimination to withstand summary judgment.

*McDonnell Douglas Formula*

In applying the *McDonnell Douglas* formula to this case, the Court notes that the defendant does not appear to dispute that the plaintiff has satisfied the first three prongs of the test. The defendant argues, however, that the plaintiff has not shown that he was replaced by someone outside the protected class.

 The Sixth Circuit has held that a plaintiff may satisfy the fourth prong of the *McDonnell Douglas* test by establishing that "a comparable non-protected person was treated better." *Mitchell*, 964 F.2d at 582–83. In order to make this showing, the plaintiff must prove that the " 'comparables' are similarly-situated *in all* respects." *Mitchell*, 964 F.2d at 583 (emphasis in original). More specifically, the plaintiff must show:

> ... the individuals with whom the plaintiff seeks to compare his/her treatment must have dealt with the *same supervisor*, have been *subject to the same standards* and have engaged in the *same conduct* without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it.

964 F.2d at 583. In other words, the plaintiff must show that all the relevant aspects of his employment situation are "nearly identical" to those of the employees who he alleges were treated more favorably. *Pierce*, 40 F.3d at 802.

The plaintiff attempts to make this showing, with regard to the first termination, by citing the affidavit of Don Reeder, a Bridgestone employee and a member of the plaintiff's labor union. In his affidavit, Mr. Reeder states that he researched the Union's file for grievance reports that would reflect the actions taken by the company when an employee was found to have falsified records. Mr. Reeder attaches six grievance reports to his affidavit, which, he contends, indicates that the company did not subject white employees to termination for falsifying records.[2]

The first grievance report was filed by employee Billy Phillips for an incident that occurred on March 22, 1990. The supervisor is listed as Bob Williams. The plaintiff has not alleged that Mr. Williams was one of his supervisors. Therefore, the employee who filed this grievance did not share the same supervisor as the plaintiff. Nor does the grievance indicate that Mr. Phillips and the plaintiff engaged in the same conduct that led to the discipline. In particular, the grievance says nothing about excessive absenteeism.

The second grievance was filed by R.D. Lane for an incident that occurred on December 27, 1990. Mr. Lane's supervisor is listed as Ken Grumbley. Mr. Lane complains of his suspension for the following conduct: "The Grievant admitted he was late on the day in question and admitted he error (sic) in filling out his time card." Neither Mr. Lane's supervisor, nor his conduct, are the same as the plaintiff's.

The third grievance, filed by James Templeton, complains of the suspension he received for presenting a false document to management to warrant an absence on January 24, 1991. No other details of the conduct are described. Mr. Templeton's supervisor is listed as Stan Pitts. As with the first grievance, the plaintiff has not shown that he and Mr. Templeton shared the same supervisor, or that Mr. Templeton's conduct included excessive absenteeism.

The fourth grievance was filed by Jerry Matthern, and complains of discipline received on January 7, 1992 for falsification of a document. Mr. Matthern's supervisor is listed as Mark Fox. Again, the plaintiff has not met his burden of showing that he and Mr. Matthern, at this time, shared the same supervisor, nor has he shown that they engaged in the same conduct.

Mr. Varnell (first name illegible) filed the fifth grievance for an incident that occurred on April 2, 1992, in which he received a suspension for falsifying a company record. Mr. Varnell's supervisor is listed as David

---

**2.** Although this affidavit may not comply with Rule 56(e) of the Federal Rules of Civil Procedure, or the Federal Rules of Evidence, the Court will consider it for purposes of resolving the Motion for Summary Judgment.

Ezzelle. The grievance does not state that the record referred to was a doctor's excuse. Even if it were, the plaintiff has not shown that he and Mr. Varnell shared the same supervisor, nor has he shown that they otherwise engaged in the same conduct.

In the sixth grievance, Dean Hill protests his suspension on April 10, 1992 for falsifying a doctor's excuse. Mr. Hill's supervisor is listed as Gary Young. The plaintiff has not shown that he and Mr. Hill shared the same supervisor or that Mr. Hill's conduct included excessive absenteeism.

Kevin Miles filed the seventh grievance for an incident that occurred on June 18, 1992. Mr. Miles complains of his suspension for falsifying a doctor's excuse. His supervisor is listed as Bobby Duke. As with the previous grievances, the plaintiff has not shown that he and Mr. Miles shared the same supervisor or that Mr. Miles' conduct included excessive absenteeism.

Although it may be that the supervisors identified in the grievances reported to Mr. Davenport, the Bridgestone supervisor who the plaintiff claims discriminated against him, this simply has not been shown by the plaintiff. Furthermore, the Court notes that the plaintiff admits in his deposition that, prior to December, 1992, he had been disciplined repeatedly for being absent from work. (Marthel deposition at 52–53). He has not shown that the individuals listed above had a similar poor work record.

Under these circumstances, the Court is not persuaded that the plaintiff has met the burden of establishing a prima facie case of discrimination with regard to his December, 1992 termination.

With respect to the March, 1993 termination, the plaintiff argues that he was treated more harshly than other similarly situated employees who have been accused of striking other employees based on two incidents described in his brief. The plaintiff does not cite any part of the record in describing the first incident. In this regard, the Court notes that it is not required to search the entire record to establish that there is no genuine issue of material fact. *See, e.g., Barnhart,* 12 F.3d at 1389.

The Court has found a brief discussion of these incidents in the plaintiff's affidavit and in his deposition. According to the plaintiff, in July, 1994, Bruce Crowder, a white employee, struck another employee, and was only given a one day suspension and counseling. (Marthel affidavit at ¶ 12; Marthel deposition at 151–52). In addition, the plaintiff states that, in another incident, a white employee, Buddy Bruce, struck another employee, and was given a 30–day suspension and counseling. *(Id.)*

 The plaintiff has offered no evidence to indicate that he and these employees shared the same supervisor, nor has he shown that their employment situation, including the number of prior disciplinary actions taken against them, was the same as his employment situation. There is, moreover, no proof that the conduct and related circumstances of the incidents in question were comparable, or if differentiating or mitigating circumstances applied. Under these circumstances, the Court is of the opinion that the plaintiff has not carried his burden of establishing a prima facie case of discrimination with regard to his April, 1994 termination.

*Legitimate, Nondiscriminatory Reasons for Actions Taken*

 Even if the Court were to assume that the plaintiff had established a prima facie case, the defendant has come forward with legitimate, nondiscriminatory reasons for its termination decisions. The defendant contends that it terminated the plaintiff in December, 1992, because Jim Davenport, the individual who made the termination decision, believed that the plaintiff had failed to come to work for 29 days without good cause and had falsified a doctor's excuse in an attempt to have his absences excused.

The defendant claims that it terminated the plaintiff in April, 1994 because Mr. Davenport, who also made this termination decision, believed the complaint from Mr. Mattern that the plaintiff had physically assaulted him. Although Mr. Mattern, after talking with union representatives, later recanted his complaint, Mr. Davenport be-

lieved, based on Mr. Mattern's demeanor when he originally made the complaint, that the plaintiff had, in fact, physically assaulted Mr. Mattern.

*Pretext*

 The plaintiff has not shown that the reasons advanced by the defendant are a pretext for discrimination. Pretext may be established directly by persuading the Court that a discriminatory reason more likely motivated the employer, or indirectly by showing that the employer's proffered reason is unworthy of belief. *Burdine*, 450 U.S. at 256, 101 S.Ct. at 1095.

The Sixth Circuit has explained that a plaintiff may demonstrate pretext by showing: (1) that the stated reasons for his firing had no basis in fact; (2) that the stated reasons for his firing were not the actual reasons; and (3) that the stated reasons for his firing were insufficient to explain the discharge. *Manzer v. Diamond Shamrock Chemicals Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994); *Barnhart*, 12 F.3d at 1390.

 The reasons given for the December, 1992 termination are supported by the record. The plaintiff does not seriously dispute that Mr. Davenport sincerely believed that the doctor's excuse provided by the plaintiff was not authentic. That Mr. Davenport may have been wrong about the doctor's excuse does not indicate that the real reason for the termination was racial discrimination. A mistaken belief that would be a legitimate reason for discharge does not indicate that the discharge is racially motivated, as long as the mistake is made in good faith. *Holder v. City of Raleigh*, 867 F.2d 823, 828 (4th Cir.1989); *Day v. City of Southfield*, 61 F.3d 903 (Table), 1995 WL 433587, at * 5–6 (6th Cir. July 21, 1995); *Leigh v. Bureau of State Lottery*, 876 F.2d 104 (Table), 1989 WL 62509, at * 4–5 (6th Cir.1989).

The reasons given for the April, 1994 termination are also supported by the record. Mr. Mattern, in apparently a very convincing manner, complained that the plaintiff had struck him. Based on reports of Mr. Mattern's demeanor when he originally made the complaint, Mr. Davenport did not believe the change in Mr. Mattern's story made after his meeting with union representatives. The plaintiff has failed to show that Mr. Davenport's belief in this regard masked racially discriminatory motives.

Having viewed all the evidence offered by the plaintiff in the light most favorable to him, the Court finds that the plaintiff has not provided sufficient evidence in support of his Title VII claims to withstand a motion for summary judgment. In other words, the Court is not persuaded that a reasonable jury could find for the plaintiff based on the evidence he has presented to the Court. Accordingly, the Court finds that the defendant has proven the absence of a genuine issue of material fact as to the defendant's motivation in terminating the plaintiff on December, 1992 and April, 1994. The defendant is entitled to judgment as a matter of law on the discrimination claims.

*Retaliation*

 The plaintiff has also alleged that the April, 1994 termination was in retaliation for his having filed an EEOC claim. In order to establish a prima facie case of retaliatory discharge, the plaintiff must show that (1) he engaged in an activity protected by Title VII; (2) exercise of that protected activity was known to the defendant; (3) the defendant thereafter took an employment action adverse to the plaintiff; and (4) there was a causal connection between the protected activity and the adverse employment action. *Canitia v. Yellow Freight System, Inc.*, 903 F.2d 1064, 1066 (6th Cir.1990).

Once the plaintiff makes this showing, the burden of production shifts to the employer to articulate a legitimate, nondiscriminatory reason for its actions. *Id.* If the defendant meets this burden, the plaintiff must demonstrate that the proffered reason was not the true reason for the actions taken. *Id.*

The defendant appears to concede that the plaintiff has established the first three elements of a prima facie case. The defendant argues, however, that the plaintiff has not shown a causal connection between his filing a claim with the EEOC and the April, 1994 termination. The plaintiff's brief does not address the retaliation claim.

■ In order to show a "causal connection," the plaintiff must provide evidence sufficient to raise an inference that his protected activity was the likely reason for the adverse action. *Canitia,* 903 F.2d at 1068; *Zanders v. National R.R. Passenger Corp.,* 898 F.2d 1127, 1135 (6th Cir.1990).

In his deposition, the plaintiff does not even allege that Mr. Davenport, the individual at the company who made the termination decision, was aware that the plaintiff had filed a claim with the EEOC. (Marthel deposition at 115, 118–19, 147–49). Furthermore, the plaintiff admits that the person at the company the defendant contends is responsible for responding to the charge, Dan Leonard, had not discriminated against him. (Marthel deposition at 118–19).

■ Without evidence indicating that the person who made the termination decision was aware of the EEOC claim, the Court is not persuaded that the plaintiff has established a prima facie case of retaliation.

■ Even if the plaintiff had made out a prima facie case of discrimination, the defendant has come forth with legitimate reasons for its termination decision. As discussed above, Mr. Davenport believed that the plaintiff had physically struck another employee. The plaintiff has not, in turn, offered any evidence that the reason articulated by the defendant was a pretext for retaliation.

Having viewed all the evidence offered by the plaintiff in the light most favorable to him, the Court finds that the plaintiff has not provided sufficient evidence in support of his Title VII retaliation claim to withstand a motion for summary judgment. Therefore, the Court finds that the defendant has proven the absence of a genuine issue of material fact as to the defendant's motivation in terminating the plaintiff on December, 1992 and April, 1994. The defendant is entitled to judgment as a matter of law on the retaliation claim.

### 42 U.S.C. §§ 1983 and 1988

In his First Amended Complaint, the plaintiff has also cited Sections 1983 and 1988 of Title 42 as another basis for his cause of action.

■ Section 1983 provides a cause of action to individuals who claims that they have been deprived of a right secured by federal law or the Constitution by a person acting "under color of state law." *See, e.g., National Collegiate Athletic Association v. Tarkanian,* 488 U.S. 179, 109 S.Ct. 454, 102 L.Ed.2d 469 (1988). The plaintiff has not alleged that Bridgestone was acting under color of state law in connection with any of the actions taken against him. Accordingly, the Court finds that the defendant has proven the absence of a genuine issue of material fact as to this element of plaintiff's Section 1983 claim, and is entitled to judgment as a matter of law on this claim.

■ With respect to the plaintiff's Section 1988 claim, it is well established that Section 1988 does not create an independent cause of action, but rather "defines procedures under which remedies may be sought in civil rights actions." *Schroder v. Volcker,* 864 F.2d 97, 99 (10th Cir.1988). Therefore, the Court is not persuaded that a reasonable jury could find for the plaintiff on this claim. The defendant is entitled to judgment as a matter of law on the Section 1988 claim.

Accordingly, the Court concludes that the defendant's Motion for Summary Judgment should be GRANTED, and all claims made by the plaintiff under federal law should be dismissed with prejudice.

### Tennessee Law Claims

The plaintiff also asserts state law claims for "outrageous conduct" and for "wrongful discharge" under Tennessee common law. Without expressly finding whether the plaintiff has made a sufficient showing to withstand summary judgment with respect to these claims, the Court, in its discretion, declines to exercise supplemental jurisdiction over the state law claims. 28 U.S.C. § 1367(c)(3). Accordingly, the state law claims are DISMISSED without prejudice.